O 91Rev. 11/82

# CRIMINAL COMPLAINT

ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>**JESUS RODRIGUEZ, MARGARITO HERNANDEZ, JORGE LNU, aka Jorge Bautista and ARMANDO MENDRANO MENDEZ** | Docket No.<br><br>MAGISTRATE'S CASE NO. SA99-0319M |
| LODGED | FILED |

Complaint for violation of Title 21 United States Code § 846

| NAME OF MAGISTRATE JUDGE<br>ELGIN EDWARDS | | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Santa Ana, CA |
|---|---|---|---|
| DATE OF OFFENSE<br>July 16, 1999 | PLACE OF OFFENSE<br>Orange County | Address of Accused (If Known) | |

AUG 20 1999 CLERK, U.S. DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA SOUTHERN DIVISION AT SANTA ANA BY DEPUTY

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning on or about July 2, 1999, and continuing to on or about August 19, 1999, in Orange County, within the Central District of California, defendants **JESUS RODRIGUEZ, MARGARITO HERNANDEZ, JORGE LNU, aka Jorge Bautista and ARMANDO MENDRANO MENDEZ** knowingly and intentionally conspired to possess with intent to distribute black tar heroin, a scheduled II controlled substance in violation of Title 21, United States Code Section 846.

In furtherance of the conspiracy on or about July 16, 1999, in Orange County, within the Central District of California, defendants **JESUS RODRIGUEZ, MARGARITO HERNANDEZ, JORGE LNU, aka Jorge Bautista** knowingly and intentionally possessed with intent to distribute and distributed approximately 296.9 grams black tar heroin, a schedule II controlled substance in violation of Title 21, United States Code Section 841(a).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>*[signature]*<br>GRACE M. BONGCARAS, Special Agent - FBI |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>**ELGIN EDWARDS**<br>*[signature]* | DATE August 20, 1999 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA: MRG:lbf REC: DETENTION (WARRANT)

ENTERED ON ICMS

AFFIDAVIT

I, Grace M. Bongcaras, being duly sworn, depose and state as follows:

1. I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been so employed since April 26, 1998. I am currently assigned to the Los Angeles Division of the FBI in the Santa Ana Resident Agency. I have received training in investigating violations of federal statutes, including those regarding illegal narcotics trafficking. Prior to my employment with the FBI, I was employed as a police officer with the Chula Vista Police Department for over two and a half years.

2. In addition to my own training and experience, I have drawn from that of my fellow case agent, FBI SA Edwin Rivera-Velez, who has worked narcotics investigations for approximately four years.

3. I am currently assigned to investigate the alleged illegal narcotics trafficking of JESUS ALEJANDRO RODRIGUEZ, (hereinafter referred to as "JESUS RODRIGUEZ"); MARGARITO HERNANDEZ; JORGE last name unknown (LNU), a.k.a JORGE BAUTISTA (hereinafter referred to as "JORGE LNU"); ARMANDO MENDRANO MENDEZ and other individuals potentially associated with them.

4. This affidavit is made in support of a complaint charging JESUS RODRIGUEZ, MARGARITO HERNANDEZ, JORGE LNU and ARMANDO MENDRANO MENDEZ with illegal narcotics trafficking in violation of Title 21, United States Code, Section 841(a)(1) and 846, possession with intent to distribute a controlled substance and conspiracy.

5. Two cooperating witnesses (CWs) have been used to further the investigation described in the following paragraphs. It is necessary to keep the CWs anonymous because if the identities of the CWs are disclosed, it would prematurely end their ability to furnish information in this and other investigation, and, therefore, would interfere with this and other investigations.

6. Investigative activity described in the following paragraphs of this affidavit involves extensive use of the two cooperating witnesses, referred to as CW #1 and CW #2. CW #1 has worked as a cooperating witness since approximately May 21, 1998. CW #1 has provided reliable information regarding local drug trafficking to the FBI in the past and has been compensated for it. CW #2 has worked as a cooperating witness since approximately May 14, 1999. The CWs have been assisting in this investigation since approximately June 24, 1999. During that time, the CWs have made two controlled purchases of black tar heroin. In each instance, the CWs followed directions and completed all tasks as directed. The CWs have made twelve consensual recordings (telephonic and non-telephonic) at the direction of law enforcement. The information provided by the CWs has been corroborated by physical surveillance and review of telephone records.

OVERVIEW OF INVESTIGATION

7. On June 24, 1999, SA Edwin Rivera-Velez and I interviewed the CWs, who advised us of the following:

a. That day, the CWs were introduced to a Mexican male at the "El Toro" market at First Street and Bristol Avenue in Santa Ana, California. The Mexican male introduced himself as "JESUS" (later identified as Jesus Rodriguez). During this meeting, JESUS RODRIGUEZ stated that he could sell "pieces of chiva." Through my training and experience, I know a "piece of chiva" to be Mexican slang for 25 grams of heroin.

b. At this introductory meeting, CW #1 asked JESUS RODRIGUEZ how much a piece of heroin costs. JESUS RODRIGUEZ said he would contact his source to find out. JESUS RODRIGUEZ gave the CWs his telephone number, 714/973-1793.

c. CW #1 received a telephone call from JESUS RODRIGUEZ later that afternoon. JESUS RODRIGUEZ said he was willing to sell 25 pieces of heroin at $450.00 per piece.

8. On July 2, 1999, SA Rivera-Velez and I watched as CW #1 telephoned JESUS RODRIGUEZ at 714/973-1793 for the purpose of scheduling a time to meet with JESUS RODRIGUEZ to discuss the purchase of heroin. This conversation was consensually recorded. The recording was subsequently interpreted and transcribed by Language Specialist Ruth Reyes of the FBI. I reviewed the translation, and learned the following:

a. JESUS RODRIGUEZ said his supplier had been arrested the previous week; however, he said he had another supplier. JESUS RODRIGUEZ said he needed to contact the new

supplier and find out the price for the heroin. JESUS RODRIGUEZ agreed to meet with the CWs later that day at the "El Toro" market in Santa Ana, California.

9. Later that day, I learned from SA Rivera-Velez that CW #1 told SA Rivera-Velez that JESUS RODRIGUEZ telephoned CW #1 and JESUS RODRIGUEZ said he would have a sample of heroin for the CWs when they met at the "El Toro" market.

10. On July 2, 1999, I participated in a physical surveillance conducted by the Orange County Regional Narcotics Suppression Program (RNSP) and SAs of the FBI in the vicinity of the El Toro Market, 1340 West First Street, Santa Ana, California, wherein the CWs received a small, black, rocky substance wrapped in clear plastic cellophane from JESUS RODRIGUEZ. After the transaction, the CWs gave the substance to SA Rivera-Velez, and SA Rivera-Velez and I transported the substance back to the office and logged it into evidence. Based upon my training and experience this substance resembled that of black tar heroin. Following the transaction, JESUS RODRIGUEZ was surveilled to an apartment complex in the area of 822 Raitt Avenue in Santa Ana, California.

11. On or about July 16, 1999, through information provided in response to an Administrative Subpoena for subscriber information for JESUS RODRIGUEZ's telephone number, 714/973-1793, I learned that the phone number was a hard-line, subscribed by Blanca Rosa Gomez at 822 S. Raitt Street #10, Santa Ana, CA.

12. On or about July 16, 1999, through a record check in Lexis-Nexis for JESUS RODRIGUEZ, I reviewed the following

information reported as of February 21, 1999: JESUS RODRIGUEZ, Male, born in 1980, with a current address of 822 N. Raitt St., Santa Ana, CA 92703.

13. On or about July 16, 1999, I reviewed information obtained through a DMV record check, which revealed the following information: JESUS ALEJANDRO RODRIGUEZ, Index number: X4202249, with a date of birth of June 15, 1980 and address as of May 9, 1998 at 822 N. Raitt, Santa Ana, CA 92701.

14. On July 16,1999, CW #1 telephoned JESUS RODRIGUEZ at 714/973-1793 to discuss the purchase of black tar heroin later that day. This conversation was consensually recorded. The recording was subsequently interpreted and transcribed by Language Specialist Ruth Reyes of the FBI. I reviewed the translation and learned the following:

a. The CWs and JESUS RODRIGUEZ agreed to meet at a church near the alley at McFadden Avenue and Raitt Street in Santa Ana. JESUS RODRIGUEZ was going to contact his supplier to obtain four pieces of black tar heroin (approximately 100 grams) to sell to the CWs at $475.00 per piece.

15. On July 16, 1999, CW #1 informed SA Rivera-Velez and me that CW #1 placed a second phone call to JESUS RODRIGUEZ at 714/973-1793 to tell JESUS RODRIGUEZ that the CWs were in Santa Ana, ready to meet with JESUS RODRIGUEZ. This conversation was consensually recorded. The recording was subsequently interpreted and transcribed by Language Specialist Ruth Reyes of the FBI. I reviewed the translation and learned the following:

a. JESUS RODRIGUEZ said he spoke with his source who did not want to do business with the CWs because his source thought the CWs were "narcs" (slang term for law enforcement officers who investigate narcotics violations). JESUS RODRIGUEZ told CW #1 he would meet him in fifteen minutes.

16. On July 16, 1999, I participated in a physical surveillance conducted by RNSP and SAs of the FBI in the vicinity of the 800 block of Raitt Street and the 7-Eleven store at the corner of Fairview Street and McFadden Avenue in Santa Ana. The purpose of the surveillance was to make a controlled purchase of 100 grams of black tar heroin from JESUS RODRIGUEZ and two other individuals introduced as "JORGE" and "CARLOS" (later identified as MARGARITO HERNANDEZ as set forth in paragraphs 25 and 26; and hereinafter referred to as such). CW #1 was equipped with a body wire and the transaction was consensually recorded. SA Rivera-Velez informed me that he gave the CWs $2000.00 to purchase the narcotics.

17. The CWs were debriefed by SA Rivera-Velez and me following the transaction. The CWs told us that the following transpired:

a. The CWs met JESUS RODRIGUEZ at the parking lot of the 7-Eleven store at the corner of Fairview Street and McFadden Avenue in Santa Ana. JESUS RODRIGUEZ told the CWs the price would be $1000.00 for two pieces (50 grams) of heroin. CW #1 told JESUS RODRIGUEZ they had agreed on $450.00 per piece. JESUS RODRIGUEZ said his supplier had raised the price. JESUS RODRIGUEZ asked the CWs, "What am I getting out of this (deal)?"

CW #1 had told JESUS RODRIGUEZ, during a previous meeting, that JESUS RODRIGUEZ would get $25.00 per piece purchased by the CWs.

b. MARGARITO HERNANDEZ agreed to sell only two "pieces" (50 grams) the first time. MARGARITO HERNANDEZ stated he needed to trust the CWs more. MARGARITO HERNANDEZ said he has a lot of business and doesn't want anything to happen to JESUS RODRIGUEZ and/or JORGE LNU. MARGARITO HERNANDEZ said the police arrested him several times already. MARGARITO HERNANDEZ said he has a lot of "carros". "Carros" is translated to mean cars. I have learned through my training and experience that this is Mexican slang for heroin. JESUS RODRIGUEZ said they can start building the trust by giving them the money in advance. MARGARITO HERNANDEZ told the CWs to give the money to JESUS RODRIGUEZ and told JORGE LNU to stay with the CWs.

c. CW #1 told CW #2, who was holding the $1,000.00 in cash, to give the money to JESUS RODRIGUEZ. CW #2 gave $1,000.00 to JESUS RODRIGUEZ. MARGARITO HERNANDEZ and JESUS RODRIGUEZ left the location in a vehicle to get the heroin. (Through listening to communications between members of the surveillance team, I am informed that when MARGARITO HERNANDEZ and JESUS RODRIGUEZ left the parking lot of the 7-Eleven Store, certain members of the surveillance team followed the vehicle to the area of 822 S. Raitt Street, Santa Ana.) JORGE LNU stayed at the 7-Eleven store with the CWs. CW #2 saw that JORGE LNU was armed with a pistol in his waistband.

d. JESUS RODRIGUEZ returned to the location with two pieces of a black, rocky substance purported to be heroin

individually wrapped in a clear plastic cellophane. After the transaction was complete, JESUS RODRIGUEZ told the CWs that they now have trust and he can sell them whatever they want. JESUS RODRIGUEZ said he could give them the other two pieces now.

18. I was informed by SA Rivera-Velez that the CWs gave the suspected black tar heroin and the unused $1000 in buy money to SA Rivera-Velez. SA Rivera-Velez and I transported the substance back to the office and logged it into evidence. Based upon my training and experience this substance resembled that of black tar heroin.

19. On July 20, 1999, CW #1 informed SA Rivera-Velez and me that on July 19, 1999, CW #1 called JESUS RODRIGUEZ to discuss a purchase of black tar heroin, on July 20, 1999. This conversation was consensually recorded. The recording was subsequently interpreted and transcribed by Language Specialist Ruth Reyes of the FBI. I reviewed the translation and learned the following:

a. CW #1 asked JESUS RODRIGUEZ if he would to talk to MARGARITO HERNANDEZ, the owner of the heroin, about conducting a heroin transaction. JESUS RODRIGUEZ advised CW #1 that MARGARITO HERNANDEZ had okayed the deals with the CWs, whatever the CWs wanted.

20. On July 20, 1999, I participated in a physical surveillance conducted by RNSP and SAs of the FBI in the vicinity of the 800 block of Raitt Street and the 7-Eleven store at the corner of Fairview Street and McFadden Avenue in Santa Ana. The purpose of the surveillance was to make a controlled purchase of

50 grams of black tar heroin from JESUS RODRIGUEZ, MARGARITO HERNANDEZ and JORGE LNU. The transaction was consensually recorded and monitored by SA Rivera-Velez via transmitter. I was informed by SA Rivera-Velez that he gave the CWs $1000 to purchase the narcotics.

21. The CWs were debriefed by SA Rivera-Velez and me following the transaction. The CWs told us that the following transpired:

a. The CWs met with JESUS RODRIGUEZ and JORGE LNU at the 7-Eleven store at the corner of Fairview Street and McFadden Avenue in Santa Ana. JESUS RODRIGUEZ said MARGARITO HERNANDEZ was not around but said it was okay to do business with the CWs. The CWs gave JESUS RODRIGUEZ $1000.00. JESUS RODRIGUEZ left with the money and JORGE LNU stayed behind. After a period of time, JESUS RODRIGUEZ returned to the 7-Eleven store and gave the CWs two pieces of a black, rocky substance purported to be heroin, individually wrapped in a clear plastic cellophane.

22. After the transaction, the CWs gave me the suspected black tar heroin and SA Rivera-Velez and I later transported the substance back to the office and logged the substance into evidence. Based on my training and experience this substance resembled that of black tar heroin.

23. On July 27, 1999, I received a surveillance report from RNSP, dated July 20, 1999. I reviewed the report which detailed the physical surveillance conducted by RNSP and FBI SAs of the transaction which took place on July 20, 1999. The following transpired:

a. JESUS RODRIGUEZ and JORGE LNU were surveilled exiting 822 S. Raitt Street #10, Santa Ana. JESUS RODRIGUEZ and JORGE LNU met with the CWs at the 7-Eleven store at the corner of McFadden Avenue and Fairview Street in Santa Ana. JESUS RODRIGUEZ left the 7-Eleven store and JORGE LNU remained with the CWs.

b. The surveillance team followed JESUS RODRIGUEZ to 822 S. Raitt Street #10, Santa Ana, California. JESUS RODRIGUEZ entered apartment #10 and then exited shortly thereafter. JESUS RODRIGUEZ then walked to 810 S. Raitt Street, Santa Ana, and met with an unknown Mexican male who entered Apartment #4 while JESUS RODRIGUEZ waited outside. The unknown Mexican male exited Apartment #4 and entered 810 S. Raitt Street, Apartment #3. The unknown Mexican male then exited Apartment #3 and re-entered Apartment #4. After exiting Apartment #4 the unknown Mexican male handed JESUS RODRIGUEZ an object. JESUS RODRIGUEZ and unknown Mexican male then walked to 822 S. Raitt Street, Santa Ana, entered and exited apartment #10.

c. JESUS RODRIGUEZ returned to the 7-Eleven store at the corner of Fairview Street and McFadden Avenue and met with the CWs.

24. On July 23, 1999, I submitted the evidence purported to be heroin obtained on July 2, 1999, July 16, 1999, and July 20, 1999, to the Drug Enforcement Administration (DEA) Southwest Laboratory in National City, California for analysis.

25. On August 2, 1999, SA Rivera-Velez debriefed the CWs and SA Rivera-Velez informed me that he learned the following:

a. On July 28, 1999, JESUS RODRIGUEZ telephoned CW #1 asking if the CWs were still interested in purchasing black tar heroin. CW #1 indicated they were still planning to purchase 50 pieces of heroin (approximately 1250 grams).

b. On July 30, 1999, JESUS RODRIGUEZ telephoned CW #1 again, asking if the CWs were still interested in purchasing the 50 pieces of black tar heroin. CW #1 indicated that they were still planning to purchase the heroin.

c. On August 2, 1999, JESUS RODRIGUEZ telephoned CW #1 once more, asking if the CWs were still interested in purchasing the black tar heroin. CW #1 indicated to JESUS RODRIGUEZ that they were still planning to purchase the 50 pieces heroin. JESUS RODRIGUEZ gave the following pager number to the CW #1: 714-215-1176. JESUS RODRIGUEZ advised CW #1 to call him at this number in case the CW needed to contact him.

26. On August 6, 1999, I reviewed information obtained through a DMV record check, which revealed the following information: CARLOS MARGARITO HERNANDEZ, a.k.a. MARGARITO HERNANDEZ, Driver License number B6012019, with a date of birth of June 13, 1967 and address as of June 16, 1997 at 810 S. Raitt, Apartment 4, Santa Ana, CA 92704. Additionally, I received a photograph from DMV of MARGARITO HERNANDEZ, which shows the same person I observed during surveillance on July 16, 1999.

27. On August 6, 1999, through a record check in Lexis-Nexis for MARGARITO HERNANDEZ, I reviewed the following information reported as of April 1, 1999: MARGARITO HERNANDEZ with a current

address of 810 S. Raitt, Apartment #4, Santa Ana, CA 92704 and Social Security Account Number 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.

28. On August 6, 1999, SA Rivera-Velez received the following information from John Ryan, Chemist of the Drug Enforcement Administration (DEA) Southwest Laboratory in National City, California:

a. A preliminary analysis conducted on the Exhibit #1, the sample of black tar heroin obtained from JESUS RODRIGUEZ on July 2, 1999 and submitted to DEA on July 23, 1999, indicated the presence of heroin.

b. A preliminary analysis conducted on the Exhibit #2, two pieces of black tar heroin purchased from JESUS RODRIGUEZ, MARGARITO HERNANDEZ, AND JORGE LNU on July 16, 1999 and submitted to DEA on July 23, 1999, indicated the presence of heroin.

c. A preliminary analysis conducted on the Exhibit #3, two pieces of black tar heroin purchased from JESUS RODRIGUEZ AND JORGE LNU on July 20, 1999 and submitted to DEA on July 23, 1999, indicated the presence of heroin.

29. On August 13, 1999, SA Rivera-Velez and I interviewed the CWs who advised us of the following:

a. On August 13, 1999, at approximately 2:30 p.m., the CWs were in the Santa Ana area looking for JESUS RODRIGUEZ and MARGARITO HERNANDEZ. The CWs saw a vehicle, known to them to belong to MARGARITO HERNANDEZ, parked in a shopping mall parking lot located at McFadden Avenue and Sullivan Street, Santa Ana, California. This vehicle was a two (2) door, burgundy, Mercury Cougar, California license plate 3SCN717.

b. CW #2 saw MARGARITO HERNANDEZ in a pool (billiards) hall and advised CW #1. The CWs approached MARGARITO HERNANDEZ. CW #1 asked MARGARITO HERNANDEZ what had happened to him. CW #1 told MARGARITO HERNANDEZ they were looking for him for some time. MARGARITO HERNANDEZ asked CW #1 if they were going to do the deal. CW #1 responded, "yes." CW #1 explained to MARGARITO HERNANDEZ that they had a problem with CW #1's cellular phone and had to get another one, with a different number. During this time, CW #1 lost contact with JESUS RODRIGUEZ and him (MARGARITO HERNANDEZ.) CW #1 further explained that they (CWs) were looking for JESUS RODRIGUEZ and/or him (MARGARITO HERNANDEZ) to reestablish negotiations for the drug transaction they had previously agreed upon, which was to purchase 50 pieces (1250 grams) of chiva - black tar heroin.

c. MARGARITO HERNANDEZ asked the CWs if they wanted to do the deal now. CW #1 advised MARGARITO HERNANDEZ that his/her brother-in-law had recently purchased about 75 pieces of black tar heroin and he would be returning to the Los Angeles area next week, possibly Monday or Tuesday. MARGARITO HERNANDEZ and the CWs tentatively agreed to do the deal on Tuesday (August 17, 1999) of next week.

d. CW #1 asked MARGARITO HERNANDEZ to provide him with a way to get in touch with MARGARITO HERNANDEZ since the CWs had no means to do so. MARGARITO HERNANDEZ gave CW #2 a piece of paper upon which MARGARITO HERNANDEZ wrote his pager number, 430-7535. It was understood the area code was 714. MARGARITO HERNANDEZ said that the chiva he previously sold to the CWs was of lesser quality

than the current supply. MARGARITO HERNANDEZ said the new supply was of far better quality. CW #1 asked MARGARITO HERNANDEZ if he planned to raise the price of the black tar heroin. MARGARITO HERNANDEZ told him that the price would remain the same.
CW #1 told MARGARITO HERNANDEZ that he/she wanted JESUS RODRIGUEZ to be present for the deal because the CWs had promised JESUS RODRIGUEZ some money for each piece. Additionally, CW #1 said JESUS RODRIGUEZ was the person responsible for the introduction of the CWs to MARGARITO HERNANDEZ.

e. During the same meeting, other young males, approximately 18 to 20 years old (possibly younger) approached MARGARITO HERNANDEZ at the parking lot. It appeared to the CWs these young males were working for MARGARITO HERNANDEZ as runners (making drug transactions and delivering drugs to different locations). The CWs indicated that, through their observations, the pool hall was the place where MARGARITO HERNANDEZ waited for his runners to bring the money collected for their drug transactions. The CWs observed that MARGARITO HERNANDEZ was upset with one of his runners. The CWs overheard MARGARITO HERNANDEZ tell the runner that he (runner) was always short. This time he was $40 short. MARGARITO HERNANDEZ told the runner not to be short again, "...let this be the last time." CW #1 saw MARGARITO HERNANDEZ had in his possession a wad of money about four inches thick. The CWs observed MARGARITO HERNANDEZ lending his vehicle, the Mercury Cougar, to two unknown males (possibly runners).

30. On August 19, 1999, SA Alba Lorena Sierra debriefed the CWs following a buy/bust operation and SA Sierra informed me that she learned the following:

a. On August 19, 1999, at approximately 1:30 p.m. CW #1 called MARGARITO HERNANDEZ's pager number, 430-7535. MARGARITO HERNANDEZ returned the page to CW #1's cellular phone. CW #1 asked MARGARITO HERNANDEZ where he wanted to meet. MARGARITO HERNANDEZ wanted to meet at the Ensenada Restaurant located at Fifth Street and Harbor Boulevard and told CW #1 to call him when he/she arrives.

b. CW #1 paged MARGARITO HERNANDEZ from the Ensenada Restaurant about four times but there was no response.

c. CW #2 went outside the Ensenada Restaurant and saw MARGARITO HERNANDEZ talking to who he/she believed through observation to be the restaurant manager. MARGARITO HERNANDEZ entered the restaurant with CW #2 and sat down with the CWs. MARGARITO HERNANDEZ told the CWs that cops have been after him for three years, but haven't been able to get him and he didn't want to get busted.

d. MARGARITO HERNANDEZ wanted the CWs to bring $5,000.00 to buy ten (10) "pieces". (250 grams of heroin). MARGARITO HERNANDEZ wanted the money first, then he would get a friend to bring the "chiva." CW #1 said he/she had to talk to his/her brother-in-law. CW #1 exited the restaurant and informed SA Rivera-Velez via telephone.

e. After speaking with SA Rivera-Velez, CW #1 said they wanted to see the chiva first. MARGARITO HERNANDEZ agreed.

MARGARITO HERNANDEZ asked CW #1 to page an unknown individual using MARGARITO HERNANDEZ pager number. CW #1 paged this unknown individual three times with a code "999." Approximately 20 minutes after the pages were sent, a Mexican male, later identified as ARMANDO MENDRANO MENDEZ as set forth in paragraph 32; and hereinafter referred to as such, wearing a black shirt and grey pants. ARMANDO MENDRANO MENDEZ was accompanied by a child approximately twelve years old.

f. CW #2 and ARMANDO MENDRANO MENDEZ, exited the restaurant and entered a green Tercel to a nearby park. At the park ARMANDO MENDRANO MENDEZ entered the public restroom and exited shortly thereafter with a brown paper bag. ARMANDO MENDRANO MENDEZ asked for the money. CW #2 told him they had to go to another location to pick up the money. ARMANDO MENDRANO MENDEZ allowed CW #2 to look inside the brown paper bag that ARMANDO MENDRANO MENDEZ retrieved from the restroom. CW #2 saw a light-colored sock with what supposedly contained the "chiva". CW#2 and ARMANDO MENDRANO MENDEZ went back to the restaurant. ARMANDO MENDRANO MENDEZ spoke with MARGARITO HERNANDEZ upon arrival. The CWs, ARMANDO MENDRANO MENDEZ and MARGARITO HERNANDEZ exited the Ensenada Restaurant to the rear of the restaurant. ARMANDO MENDRANO MENDEZ showed the sock containing the black tar heroin to the CWs and said to check it. CW #1 said no, but instead, to do it in the car. CW #1 sat in the front passenger seat of the CWs, vehicle and CW #2 sat in the driver's seat. ARMANDO MENDRANO MENDEZ sat in the rear right passenger seat. MARGARITO HERNANDEZ stayed nearby outside of the vehicle.

g. CW #1 took the sock, which was tightly wound and counted the pieces by feeling them, since the sock was tied. CW #1 counted ten (10) "pieces". CW #1 said okay and that he/she would call his/her brother-in-law. CW #1 placed the sock under the driver's seat of the vehicle. ARMANDO MENDRANO MENDEZ retrieved the sock and placed it in his pants.

h. CW #1 exited the vehicle and wiped his face with his handkerchief which indicated to FBI SAs that the CWs had seen the heroin. ARMANDO MENDRANO MENDEZ exited the vehicle and went back inside restaurant. CW #1 followed ARMANDO MENDRANO MENDEZ inside the restaurant while CW #2 remained outside with MARGARITO HERNANDEZ. ARMANDO MENDRANO MENDEZ and CW #1 exited the restaurant and joined CW #2 and MARGARITA HERNANDEZ. ARMANDO MENDRANO MENDEZ asked the CWs for the money and said he was leaving. ARMANDO MENDRANO MENDEZ walked towards the green Tercel.

31. FBI SAs, RNSP, and SAPD arrived on scene and effected the arrest of MARGARITO HERNANDEZ and ARMANDO MENDRANO MENDEZ. During a search incident to arrest, ARMANDO MENDRANO MENDEZ, was discovered to have the aforementioned sock containing 10 pieces of black tar heroin (250 grams) concealed in the front of his pants. MARGARITO HERNANDEZ AND ARMANDO MENDRANO MENDEZ were taken into custody by the FBI and transported to SAPD for processing.

32. ARMANDO MENDRANO MENDEZ identified himself as ARMANDO MENDRANO to SA Rivera and me. A California Driver License, number A4802251, was retrieved from his person, reflecting a physical description matching that of ARMANDO MENDRANO MENDEZ.

33. Based upon my training and experience, and the foregoing, I believe probable cause exists to believe JESUS RODRIGUEZ, MARGARITO HERNANDEZ, JORGE LNU, and ARMANDO MENDRANO MENDEZ are involved in illegal narcotics trafficking of black tar heroin, in violation of Title 21, United States Code, Section 841(a)(1), possession with intent to distribute a controlled substance and 846, conspiracy.

Grace M. Bongcaras
Special Agent
Federal Bureau of Investigation

Sworn to me and subscribed before me on this
20 day of August, 1999.

UNITED STATES MAGISTRATE JUDGE